**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**JANICE E. BRINSON,**

      **Plaintiff,**

**vs.**                     **Case No. 4:09cv114-RH/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be reversed and remanded.

**Procedural status of the case**

Plaintiff, Janice E. Brinson, applied for disability insurance benefits. Her last date of insured status for disability benefits is December 31, 2011. R. 66.[1] Plaintiff alleges

_____

    [1] The record was filed only as an electronic document. Doc. 10 and 10-1 through doc. 10-5. References here are to page numbers in the lower right hand corner of this document.

disability due to fibromyalgia, degenerative disc disease, depression, and anxiety, with onset on March 15, 2006.  R. 21.  Plaintiff was 48 years old at the time of the administrative hearing (on April 15, 2008), has a 9th grade education, and has past relevant work certified nurse assistant (CNA).  R. 22.  T

At step 2, the Administrative Law Judge found that Plaintiff has several "severe" impairments (degenerative disc disease, fibromyalgia, depression, and anxiety) but determined that she still has the residual functional capacity to do light work with some moderate restrictions.  R. 67-68.  He found that while Plaintiff cannot return to her past relevant work as a certified nurse assistant, she has the functional capacity to perform work as a can packer, packer, housekeeper, and assembler, jobs identified by a vocational expert.  R. 72-73.   Consequently, he concluded that she is not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232,

1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
        equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past
        relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Medical evidence**[2]

On January 28, 2005, Plaintiff had an MRI of her lower back, but the findings were "unremarkable."  R. 223.

On March 8, 2005, a second MRI revealed at L3-L4, a diffuse disc bulge with a focal hyperintense zone in the midline, suspected to be an annular fissure or tear, but without disc protrusion, and at L4-L5 and L5-S1, disc dessication without canal stenosis or neural foraminal encroachment.  R. 221.

On May 31, 2005, Plaintiff was seen by Teressa Bruner, ARNP.  R. 369.  Plaintiff reported that she had injured her back several months earlier and had chronic pain since then.  *Id.*  She complained of excessive weight gain and was not physically active. *Id.*  She was receiving chiropractic treatment, was not taking medications for pain, and had symptoms of depression.  *Id.*  Nurse Bruner discontinued her current medication, Paxil, and again prescribed Zoloft.[3]  *Id.*

On June 6, 2005, NP Bruner found Plaintiff to be obese.  R. 368.  Plaintiff's height and weight were not indicated.  *Id.*

_____

[2] Information about prescription medications is from PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages from these websites are not attached to this report and recommendation because the definitions are not likely to be in dispute.

[3] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On September 29, 2005, Plaintiff was seen by NP Bruner with swelling in her hands, legs, and feet, and "severe joint pain."  R. 367.  She did not complain of depression or anxiety on this visit.

On February 15, 2006, Plaintiff was seen by NP Bruner for depression.  R. 366. She had not been "faithful" in taking Zoloft as prescribed.  She said she was unable to concentrate, and had obsessive compulsive symptoms "with remembering to turn off lights, lock doors, etc."  *Id*.  She had a "strong family history of depression."  *Id*.  A referral for psychiatric counseling was planned.  *Id*.  Effexor[4] and Xanax[5] were prescribed.  *Id*.

On March 6, 2006, Nurse Bruner reported that Plaintiff was crying and complained of anxiety and panic attacks.  R. 365.  She had lost her prescription of Effexor and Xanax the week before, and she had been "out about 5 days."  *Id*.  The psychiatric referral had not taken place because Plaintiff had not returned with her insured provider list.  *Id*.  Effexor and Xanax were again prescribed.  *Id*.  Plaintiff's husband said he would help her keep up with her medication.  *Id*.

On March 15, 2006, she returned to Nurse Bruner and was treated for depression.  R. 364.  She was still having obsessive compulsive impulses.  *Id*.  The need to keep her psychiatric appointment was "reinforced."  *Id*.

---

[4] Effexor is prescribed for the treatment of depression – that is, a continuing depression that interferes with daily functioning.  Effexor is also prescribed to relieve abnormal anxiety (generalized anxiety disorder and social anxiety disorder), which may include sleep disturbance.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[5] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders.  Anxiety associated with depression is also responsive to Xanax.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On August 1, 2006, Plaintiff returned for follow up with her anxiety, panic attacks, depression, and OCD (obsessive compulsive disorder).  R. 363.  She saw Dr. Skipper.  *Id.*  She seemed to Dr. Skipper to be "fairly stable."  *Id.*  She denied any visual or auditory hallucinations, but had very poor concentration and poor immediate memory.  *Id.*

On April 18, 2006, Plaintiff was examined by Dr. Gregg Alexander on a referral from vocational rehabilitation.  R. 355.  He noted the two MRI scans discussed above, finding evidence of disc degeneration at L4-L5 and L5-S1 and a small annular tear at L3-L4.  *Id.*  Plaintiff reported that her pain had been worse in the past few months and that she was on medical leave from her job as a CNA.  *Id.*  Plaintiff was 6 feet 1 inch tall, and weighed 252 pounds.  *Id.*  Dr. Alexander noted "exaggerated difficulty moving from sitting to standing or from lying to sitting."  *Id.*  He found "non-organic pain reproduced with the Waddell simulated axial loading test and simulated passive rotation test."[6]  *Id.*  He found "incomplete effort with muscle strength testing," without muscle atrophy or fasciculation.[7]  *Id.*  Dr. Alexander concluded that while there was evidence of disc degeneration and a small annular tear, there was no recurrent low back pain, no objective findings of lumbar radiculopathy, and there was "a high degree of symptom

---

[6] The Waddell test involves signs for nonorganic sources of lower back pain.  Wick v. Barnhart, 173 Fed.Appx. 597, 599 (9th Cir. Mar 10, 2006) (not selected for publication in the Federal Reporter, No. 04-35579).

[7] A fasciculation is a small local involuntary muscular contraction visible under the skin, representing spontaneous discharge of a number of fibers innervated by a single motor nerve filament.  DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

magnification." *Id.* He ordered another MRI, but did not believe that "disability to this degree can be objectively sustained." R. 356.

Another MRI was taken on May 23, 2006. R. 352-353. On June 8, 2006, Dr. Alexander thought that the results were essentially unchanged from March 8, 2005. R. 351. He noted that Plaintiff was "bothered by pain and stiffness throughout her hands and feet and extending to her elbows" and had "hip pain which requires that she use[] a cane." *Id.* Passive rotation was painful. *Id.* Dr. Alexander saw no actual joint effusion or evidence of lumbar radiculopathy. *Id.* He said that she had "[m]ulti level lumbar disc degeneration L3-4, L4-5, and L5-S1 with small annular tears. This certainly explains low back pain." *Id.* There were no indications, however, that surgery would help. *Id.* Dr. Alexander also said: "In regard to her hand pain, foot pain, hip and elbow pain, Janice has symptoms suggestive of possible rheumatoid arthritis." *Id.* He prescribed hydrocodone[8] and recommended that she see a rheumatologist. *Id.* Dr. Alexander said that he thought that Plaintiff was able to work in a modified capacity. R. 349. He thought that she should avoid lifting more than 25 pounds, and avoid frequent or sustained forward bending. *Id.* He thought that using her hips to squat would be difficult until she had been evaluated by a rheumatologist. *Id.*

Plaintiff was evaluated by a rheumatologist, Dr. Shahid Zeb, on August 18, 2006. R. 404. Dr. Zeb noted that Dr. Alexander had not found any significant abnormality. *Id.*

---

[8] Hydrocodone is a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

Plaintiff told Dr. Zeb that she had pain "in on all her joints, and all her muscles." *Id.* He

found:

> She complains of swelling in her PIP joints, and has difficulty putting and
> taking her rings off. She has pain in the wrists, elbow, shoulders across
> her neck, hips, lower back, knees, and ankles with swelling. She has
> difficulty going to sleep and also has sleep maintenance problem[s]. Her
> sleep is very restless, and she feels extremely tired in the morning.

R. 404. On examination, Dr. Zeb found that Plaintiff had "tenderness involving all the

tender points fo fibromyalgia syndrome, in fact, she has more than the 11 out of the 18

designated fibromyalgia spots." R. 405. He planned to do a "workup to rule out

rheumatoid arthritis, which can coexist with fibromyalgia syndrome." *Id.* He prescribed

trazodone[9] for sleep. *Id.*

On followup on September 27, 2006, Dr. Zeb noted that Plaintiff's rheumatoid

factor was negative. R. 399. He said that Plaintiff still exhibit multiple tender points in

the areas for fibromyalgia, but her muscle power was normal. *Id.* Dr. Alexander

determined that the clinical diagnosis was fibromyalgia, although some laboratory

reports were pending. R. 399-400.

At the request of the state agency, Plaintiff had a consultative psychological

evaluation by George L. Hovat, Ph.D., on December 18, 2006. R. 415. Plaintiff was

driven to the interview by her daughter. *Id.* She walked with a cane. *Id.* Her height

was 6 feet 1 inch, and she then weighed 203 pounds. *Id.* Dr. Hovat obtained

information from Plaintiff and her daughter, and found them to be reliable informants.

*Id.* Plaintiff said she stayed at home and her daughter took care of her. R. 416.

---

[9] Trazodone hydrochloride, sold as Desyrel, is an antidepressant. PDRhealth™,
PHYSICIANS DESKTOP REFERENCE.

Dr. Hovat found Plaintiff to be drowsy, overweight, and exhibiting "extremely slowed" motor activity.  R. 416.  He found her to be "distractable," that "anxiety interfered with her concentration, and her memory was limited as she missed two of three items after five minutes."  *Id.*  Dr. Hovat said that although Plaintiff was cooperative, Plaintiff's facial expression was depressed, and she avoided eye contact. *Id.*  Dr. Hovat thought that Plaintiff was of below average intelligence based upon her verbal skills during the interview.  *Id.*  He said that "her fund of knowledge seemed to be limited by her IQ, her education, her memory, and her thought disorder."  *Id.*  He found that: "Her abstraction was concrete, her judgment was poor, her reality testing and her insight were unaware, and her decision making was confused."  *Id.*  He said that her "coping ability seemed to be exhausted."  *Id.*  He noted:

> Her skill deficits appeared to be in the areas of intellect/education,
> communication, interpersonal relationships, decision making, self control,
> and activities of daily living.

R. 416-417.  He said that her "level of social judgment makes her vulnerable to being victimized, and she isolates due to her illness."  R. 417.

Plaintiff told Dr. Hovat that she heard voices telling her that she left the stove on, or the iron on.  R. 417.  She said she had to keep checking to see that these things were not on.  *Id.*  Her daughter said that her mother had anxiety attacks, worrying about things.  *Id.*  Plaintiff repeatedly told Dr. Hovat that she was "in my box," that she did not have to be bothered when she was "in her box."  R. 416, 417.

Dr. Hovat administered a psychological test, the WMS-III (Wechsler Memory Scale).  R. 417, 419.  Plaintiff scored below the first percentile in "auditory immediate," "visual immediate," "immediate memory," "auditory delayed," "visual delayed," "auditory

recognition delayed," "general memory," and "working memory." R. 417-418. He said

that Plaintiff "displayed agitation toward the testing process," and "wanted to go home."

R. 418. He said she had a "very low concentration level," and "talked about things off

the topic." *Id.* She became verbally aggressive in answers "at times." *Id.* Dr. Hovat's

diagnosis was bereavement, dementia NOS, schizophrenia, and paranoid type. *Id.* He

concluded:

> She is in need of constant supervision. Someone needs to know her
> whereabouts at all times. She should probably not be picking her
> grandson up off the bus.

*Id.* He thought she should be entitled to social security benefits, but was incapable of

managing her own funds. *Id.*

On June 22, 2007, Plaintiff sought treatment for severe pain in her lower back

due to fibromyalgia. R. 447. Plaintiff said that she had been hoeing in her garden at the

onset of these symptoms. *Id.* On June 25, 2007, Plaintiff had spinal x-rays. R. 455.

The results were normal. *Id.*

On March 31, 2008, Nurse Practitioner James N. Bryan completed a "physical

capacities evaluation" form. R. 464. He thought that Plaintiff could only lift 5 pounds

occasionally, and 1 pound frequently. *Id.* He determined that Plaintiff could sit, stand,

or walk only 1 hour a day for each activity. *Id.* He said that Plaintiff could never climb

stairs or ladders, perform gross manipulation, bend, stoop, reach overhead, or work

around hazardous machinery. *Id.* He thought that she would likely be absent from work

more than four days per month. *Id.* He explained that Plaintiff's "activities are greatly

restricted by her . . . fibromyalgia." *Id.* He said that pain was present to such an extent

as to be distracting from adequate performance of work. R. 463. He thought that

physical activity would greatly increase her pain to such a degree as to distract her from tasks or cause total abandonment of tasks. *Id.* He also thought that drug side effects could be expected to be severely limiting. *Id.*

**Evidence from the administrative hearing**

Plaintiff testified that she had worked for the same nursing home as a certified nurse assistant for 20 years. R. 20. She stopped working because she could no longer push or pull the patients, or reach overhead. R. 21. She said she missed a lot of work due to her back problems. *Id.* She was using a cane at the hearing, and had been using a cane off and on since 1990. *Id.*

Plaintiff said that in addition to back pain, she had pain in her knuckles, ankles, knees, and her skin was "sore to touch." R. 23. She thought that these were symptoms of fibromyalgia. *Id.* She said that all of her joints and muscles "hurt all the time" at a level of 4 out of 10 every day. *Id.* She said the pain was worse in cold or cloudy weather. R. 24. She said that on a bad day, her husband had to lift her to put her in a chair, to take her to the bathroom, and to clean her. *Id.* She said she had such bad days "every two or every three months completely. . . for it go completely out." *Id.* She said "I'm talking completely nothing. Can't do nothing." R. 25. On these days, she said she cannot get out of bed unless someone helps her. *Id.* She said she had "a cane stick and I got a wheelchair." *Id.* She said she also uses "what the man scoot up under the cars with," that lays flat with four wheels, and she lies on it and moves about her home "when it go completely out." R. 26.

Plaintiff also testified that she experiences anxiety. R. 27. She said that she could not sleep except for short periods, and takes naps during the day. R. 28-29. She said she slept only about 1.5 hours a day. R. 30. She said that her inability to sleep had been "going on for a long while." R. 31.

Plaintiff said she had been taking her medications for depression as prescribed. R. 31. She said she had "a lot of voices in my head," and that "they will take over" if she does not concentrate. R. 32. She said that "it is mean voices saying mean stuff." *Id.* She said that her washing machine was "always talking," saying "line one, line one." R. 33. She said she has to go back and forth checking that she has unplugged appliances or closed the door. *Id.* She said that hearing voices "started coming on strong" in the latter part of 2005, probably about August. *Id.*

Plaintiff testified that she cannot read anymore because she hears voices. R. 40-41. She said that she hears voices every day, and never has "a peaceful moment." R. 43. She said that the medicines do not help with hearing voices. *Id.* She said: "I need somebody distract me from the voices and stuff. I can't stand to be myself and nothing distract me from the voices." R. 45-46. She said that Lexapro[10] made her sluggish in the morning. R. 44.

Plaintiff said that during the day, she cuts out fabric "if my fingers will let me," "like Japanese decoration and stuff like that" to "keep the voices away." R. 34. "Just doing something." *Id.* "Anything just to keep busy." *Id.* She does not do this on a daily basis, she said. R. 35.

---

[10] Lexapro is prescribed for major depression a persistently low mood that interferes with daily functioning. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff said that she thought she could stand or sit for only about 20 minutes. R. 36. She said she cannot do much sitting, and spends a lot of time each day (three to four hours) lying down. R. 37. She said that she props her feet up due to swelling in her ankles. R. 38. She had ridden to the hearing in a car for about an hour. R. 38. She said she could not climb a flight of stairs or bend to pick up something from the floor. R. 41-42.

Plaintiff said she did no cleaning around her home. R. 39. She last did cleaning in 2006. *Id.* Her husband does the grocery shopping and she stays in the van. *Id.* Her only social contacts, she said, were at home with her husband, daughter, son, and their families. R. 40.

## Legal analysis

### The credibility of Plaintiff's testimony

Plaintiff contends that the Administrative Law Judge did not properly evaluate Plaintiff's testimony concerning the pain and limitations she experiences, and did not provide an adequate basis for review. Doc. 12, pp. 12-13.

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d

1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies the pain standards is itself sufficient to support a finding of disability. Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted). "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

When discussing Plaintiff's credibility, the Administrative Law Judge gave "great weight to the opinions and reports of Dr. Alexander." R. 71. He said that Dr. Alexander's opinions were supported by clinical findings and diagnostic scans, and consistent with the record as a whole. *Id.* As noted by the ALJ, the diagnostic scans

"revealed basically *mild* abnormalities." R. 70 (emphasis added). The ALJ also noted

that Dr. Alexander had determined that Plaintiff's pain responses during his examination

were exaggerated, with a "high degree of symptom magnification." R. 69. He observed

that although Dr. Alexander found that Plaintiff had a probable annular tear and diffuse

disc bulging revealed, Dr. Alexander thought that Plaintiff could still work in a modified

capacity, avoiding weights more than 20 or 25 pounds, frequent or sustained forward

bending, and squatting. *Id.*

The ALJ also said that he discounted Plaintiff's testimony with regard to her

degenerative disc disease in part because she was seen by "Dr. Bruner" (Nurse

Practitioner Bruner) "on several occasions during 2006 and did not report symptoms of

back or leg pain." R. 70. Low back pain was mentioned on May 31, 2005, R. 369, and

Plaintiff complained of swelling in her hands and feet, and severe joint pain, on

September 29, 2005. R. 367. But Plaintiff saw NP Bruner on five other occasions and

did not complain of any sort of spinal pain.[11] R. 368, 366, 365, 364, 363.

These credibility findings are supported by substantial evidence in the record

discussed above. This substantial evidence supports the ALJ's credibility conclusion as

to the severity of Plaintiff's back and leg pain arising from degenerative disc disease.

---

[11] The ALJ also noted that in June, 2007, Plaintiff injured her back while hoeing her garden, and reasoned that "[t]his activity casts doubt on the limitations caused by the claimant's back and leg pain." R. 70. "The ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work." Ross v. Apfel, 218 F.3d 844, 849 (8th Cir. 2000). The hoeing attempt resulted in a trip to the doctor with significant back pain. There is no evidence that Plaintiff routinely hoes in the garden. An unsuccessful attempt to hoe in a garden is not substantial evidence to support the ALJ's credibility finding, standing alone.

This, however, does not resolve this appeal. Dr. Alexander focused only upon

Plaintiff's degenerative spinal condition. That was his field of expertise. He did not

discount the possibility of a rheumatic cause for Plaintiff's subjective symptoms, and he

thought that she should see a rheumatologist. She did. She saw Dr. Zeb, and he

concluded that she had fibromyalgia. That Dr. Alexander found Plaintiff to be

exaggerating symptoms, when viewed from his perspective (evaluating pain from

degenerative disc disease),[12] is not inconsistent with disability due to fibromyalgia. A

patient's subjective complaint "is an essential diagnostic tool" for the treating physician.

Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003), *quoting* Flanery v.

Chater, 112 F.3d 346, 350 (8th Cir. 1997).

Further, Dr. Alexander did not entirely discount Plaintiff's experience of pain from

degenerative disc disease. After reviewing the latest MRI, he said that she had "[m]ulti

level lumbar disc degeneration L3-4, L4-5, and L5-S1 with small annular tears. This

---

[12] The results from the Waddell's test do not necessarily show malingering. Wick v. Barnhart, 173 Fed.Appx. 597, 599 (9th Cir. Mar 10, 2006) (not selected for publication in the Federal Reporter, No. 04-35579). "Malingering is not the only conclusion to be drawn from the exhibiting of Waddell signs." Hilmes v. Barnhart, 118 Fed.Appx. 56, 61 (7th Cir. Aug 24, 2004) (not selected for publication in the Federal Reporter, No. 03-4262).

> It is true that the test is an aid, but it is not definitive. *See Nonorganic Physical Signs in Low-Back Pain*, Waddell, et al., *Spine*, vol. 5, 1980 (The test helps clarify the assessment of purely physical pathological conditions); *Behavioral Responses to Examination: A Reappraisal of the Interpretation of "Nonorganic Signs"*, Main and Waddell, *Spine*, vol. 23, 1998 ("Behavioral signs are not on their own a test of credibility or faking.").

Donaldson v. Astrue, 2009 WL 3161698, *10, n. 4 (N.D. Fla. Sep 28, 2009) (No. 3:08CV386/MCR/MD).

certainly explains low back pain." R. 351. The ALJ found as much when he determined

at step 2 that Plaintiff's degenerative disc disease is a "severe" impairment.

After concluding that Plaintiff's testimony regarding the disabling effects of her

degenerative disc disease was not credible to the degree alleged, the ALJ turned his

attention to the evidence of disability from fibromyalgia to determine whether this

medical condition could reasonably be expected to give rise to the symptoms alleged by

Plaintiff.[13] R. 70.

"Fibromyalgia is a rheumatic disease and the relevant specialist is a

rheumatologist." Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).[14]

> The Ninth Circuit has described fibromyalgia as a "rheumatic disease that
> causes inflammation of the fibrous connective tissue components of
> muscles, tendons, ligaments, and other tissue. Common symptoms . . .
> include chronic pain throughout the body, multiple tender points, fatigue,
> stiffness, and a pattern of sleep disturbance that can exacerbate the cycle
> of pain and fatigue associated with this disease." *Benecke v. Barnhart*,
> 379 F.3d 587, 589-90 (9th Cir. 2004).

Davis v. Astrue, 287 Fed.Appx. 748, 762 (11th Cir. Jul 09, 2008) (not selected for

publication in the Federal Reporter, No. 07-11648). The signs of fibromyalgia,

according to American College of Rheumatology guidelines, are primarily tender points

on the body. Green-Younger v. Barnhart, 335 F.3d at 107. The court there said:

"Green-Younger exhibited the clinical signs and symptoms to support a fibromyalgia

---

[13] He said: "While it appears from the above, that the claimant's alleged disabling back and leg pain could not reasonably be expected to be the result of her degenerative disc disease, it is noted that she was also diagnosed with fibromyalgia." R. 70.

[14] The court found that the administrative law judge had an "all pervasive misunderstanding of the disease," finding inappropriate that the ALJ criticized the claimant "for having consulted a rheumatologist rather than an orthopedist, neurologist, or psychiatrist." 78 F.3d at 307.

diagnosis under the American College of Rheumatology (ACR) guidelines, including primarily widespread pain in all four quadrants of the body and at least 11 of the 18 specified tender points on the body." *Id.*

It is a misunderstanding of the nature of fibromyalgia to require " 'objective' evidence for a disease that eludes such measurement." Green-Younger, 335 F.3d at 108; Lee v. BellSouth Telecommunications, Inc., 2009 WL 596006, *8 (11th Cir. Mar 10, 2009) (not selected for publication in the Federal Reporter, No. 07-14901). "Moreover, a growing number of courts, including our own . . . have recognized that fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.' "Green-Younger, 335 F.3d at 108 (citations to cases from the 6th, 8th, and 9th Circuits omitted). "[P]hysical examinations will usually yield normal results – a *full range of motion, no joint swelling, as well as normal muscle strength* and neurological reactions." *Id.*, at 108-109 (emphasis added). "[S]welling of the joints is *not* a symptom of fibromyalgia . . . ." Sarchet, 78 F.3d at 307 (emphasis added). *See also* Brown v. Barnhart, No. 05-5143, 2006 WL 1431446, *2 and n. 1 (10th Cir. 2006) (unpublished).

The Eleventh adopted this reasoning in an unpublished decision, Stewart v. Apfel, No. 99-6132, 245 F.3d 793, 2000 U.S.App. LEXIS 33214 (11th Cir. Dec. 20, 2000). In Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005), while acknowledging that Stewart is not binding precedent, the court said:

> In *Stewart*, we reviewed medical research on fibromyalgia, which often
> lacks medical or laboratory signs, and is generally diagnosed mostly on a
> individual's described symptoms. Because the impairment's hallmark is
> thus a lack of objective evidence, we reversed an ALJ's determination that
> a fibromyalgia claimant's testimony was incredible based on the lack of

objective evidence documenting the impairment. *Id.* 245 F.3d 793, 2000 U.S.App. LEXIS 33214, at *9, n. 4.

405 F.3d at 1211 and n. 3.

Determining the severity of fibromyalgia, however, is very difficult:

Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 BRITISH MED.J. 386 (1995); *Preston v. Secretary of Health & Human Services*, 854 F.2d 815, 818 (6th Cir.1988) (per curiam), but most do not and the question is whether Sarchet is one of the minority.

Sarchet, 78 F.3d at 307.

The ALJ determined that Plaintiff was not significantly limited by fibromyalgia because she was hoeing in her garden in June, 2007, and reported in April, 2006, that she could cook, do some house cleaning, do laundry, and go shopping. *Id.* He noted that although she testified that she stopped cooking in 2006, she said that she stopped because she was hearing voices, not due to fibromyalgia. R. 70-71. He also observed that Dr. Zeb said that she did not show signs of any inflammatory polyarthritis. R. 70.

These reasons are not substantial evidence in the record to determine that Plaintiff does not have a medical condition (fibromyalgia) that reasonably may be expected to give rise to the pain alleged.

First, that Plaintiff does not suffer from inflammatory polyarthritis is not inconsistent with the diagnosis of fibromyalgia. There is no evidence that Dr. Zeb's diagnosis of fibromyalgia was undermined by the lack of a positive sign for rheumatoid arthritis. Dr. Zeb said that rheumatoid arthritis can *coexist* with fibromyalgia syndrome, R. 405, but that it was not coexistent in Plaintiff's case does not mean that the fibromyalgia was not present.

That Plaintiff tried to hoe in her garden on one occasion and experienced an exacerbation of pain is not substantial evidence in the record to conclude either that fibromyalgia could not reasonably be expected to give rise to the pain alleged, or that fibromyalgia does not significantly limit Plaintiff's ability to work. This is especially true when considered with the other evidence of daily activities relied upon by the ALJ, all of which comes from her own report. R. 143. She said there that she could shower and dress, but only with help. *Id.* She said she had numbness in her finger when she dressed, and that she hurt "every time I raise the spoon to mouth." R. 144. With regard to cooking, she said she fixed Sunday dinner for her family but it wore her completely out. R. 145. She said it took all day to fix Sunday dinner. *Id.* She said she had a stool with wheels so that she could clean the toilet on good days, and sometimes fold a load of clothes. *Id.* She said she could not rake or hoe because bending hurts. R. 146. She said she rode in a car lying in the back. *Id.* She said that her husband gathered items from the shelf for her when she went shopping. *Id.* She said that due to the pain and finger numbness, she could not pay bills, count change, handle a savings account, or use a check book. *Id.* All of this evidence of daily activities is not substantial evidence to support the conclusion that Plaintiff's fibromyalgia is not significantly limiting. Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (a conclusory citation to a claimant's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing).

The record with respect to the severity of Plaintiff's fibromyalgia, however, incomplete. Dr. Zeb did not express an opinion as to the severity of Plaintiff's experience of fibromyalgia. Nurse Practitioner Bryan did, finding that Plaintiff is completely disabled by fibromyalgia. R. 464. While a nurse practitioner's opinion is not entitled to the deference due a treating physician, it is still important evidence and must be duly considered. Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003), citing 20 C.F.R. § 404.1513(d)(1) (nurse practitioner). That is especially so here, as NP Bryan appears to have been a treating source with some familiarity with Plaintiff's condition acquired over time.

Where there is an ambiguity in the treating physician's records or opinion, the Administrative Law Judge should take steps to clarify it:

> Additionally, if the ALJ determines that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant, the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e).

Newton v. Apfel, 209 F.3d 448, 453 (5th Cir. 2000). The Commissioner's regulations provide that if "the evidence we receive from your treating physician . . . is inadequate for us to determine whether you are disabled,"

> [w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available. *We will seek additional evidence or clarification from your medical source when the report from our medical source contains a conflict or ambiguity that must be resolved , the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.* We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical

evidence is obtained over the telephone, the telephone report will be sent
to the source for review, signature and return.

20 C.F.R. § 404.1512(e)(1) (emphasis added).  *See also*, Rosa v. Callahan, 168 F.3d

72, 79 (2d Cir. 1999) ("One of our recent opinions confirms, moreover, that an ALJ

cannot reject a treating physician's diagnosis without first attempting to fill any clear

gaps in the administrative record) (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir.

1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek

additional information from [the treating physician] sua sponte.")).

Dr. Zeb apparently did not treat Plaintiff after he entered his diagnosis, but she

did receive treatment from her primary care source.  A remand is recommended,

therefore, to obtain further evidence from Dr. Zeb or another suitable rheumatologist,

and primary treating sources, if available.  The physicians should be asked to determine

the diagnosis and, if the diagnosis still is fibromyalgia, to determine the severity of it and

its effects upon Plaintiff's abilities to do work.

On remand, the Commissioner is required to consider all of Plaintiff's

impairments in combination.[15]  Had Plaintiff's claim of disability been dependent *only*

upon her degenerative disc disease, the ALJ's determination would be affirmed as

discussed above.  Still, Dr. Alexander determined that Plaintiff suffered some pain from

_____

[15] All impairments, whether "severe" or not, must be evaluated in combination at all
stages of the analysis.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d
1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990);
Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993); Hudson v. Heckler, 755 F.2d 781,
785 and n. 2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ
must make specific and well-articulated findings as to the effect of the combination of
impairments when determining whether an individual is disabled."  Davis v. Shalala, 985
F.2d at 534.

that condition. The effects of pain from degenerative disc disease, therefore, should be considered in combination with other impairments, including fibromyalgia, on remand.

**Obesity**

Plaintiff contends that the ALJ erred at step 2 in failing to find that she has another "severe" impairment, obesity. Doc. 12, p. 17. Plaintiff argues that this caused the ALJ to err in failing to consider the effects of Plaintiff's obesity in combination with other impairments. *Id*.

At step 2, the issue is whether Plaintiff has shown that he has a condition which has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521). "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

Listing 9.09 (Obesity) was deleted on October 25, 1999. 64 Fed. Reg. 46122 (1999), cited in SSR 02-01p. Obesity still, however, may be a medically determinable impairment that should be considered in making a determination of disability at all steps, and this is reflected in changes to a number of other Listings. SSR 02-01p. Social Security Ruling 02-01p provides guidance about how to evaluate obesity. *Id*. Obesity may "meet" the requirements of a listed impairment if there is another impairment that, in combination with obesity, meets the requirements of a listing, or if a combination of impairments, including obesity, is equal to a listed impairment. *Id.*, ¶ 7. This may occur

if obesity increases the severity of related impairments so that the combination meets a listing. *Id.*, ¶ 7.

> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.*, ¶ 8.

Defendant is correct, however, that Plaintiff presented no evidence that she has any functional limitations arising from obesity. Doc. 18, p. 10. At the outset of her claim, she did not allege disability from obesity. R. 119. Further, although she was diagnosed as being obese on two occasions, on neither occasion was there any evidence that obesity caused any functional problems. R. 368, 400. <u>James v. Barnhart</u>, 177 Fed.Appx. 875, 878 n. 2 (11th Cir. Apr 17, 2006) (not selected for publication in the Federal Reporter, No. 05-16238) (there was no medical evidence from which the ALJ could have concluded that the claimant's obesity was a "severe" impairment).

The argument as to obesity, therefore, is not persuasive. The ALJ did not err in failing to find at step 2 that Plaintiff's obesity was a "severe" impairment.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge in part were not based upon substantial evidence in the record and did not correctly follow the law as explained above. The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and the case should be remanded to obtain further evidence from Dr. Zeb or another suitable rheumatologist, and from primary

treating sources, if available, and to reconsider all of Plaintiff's impairments in combination.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and **REMANDED** for the purposes set forth above.

**IN CHAMBERS** at Tallahassee, Florida, on December 8, 2009.

 s/    William C. Sherrill, Jr.<br>
WILLIAM C. SHERRILL, JR.<br>
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:09cv114-RH/WCS